**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

KATHY SUE ANTHONY,

                        Plaintiff,

      v.                                 No. 1:14-CV-848
                                                (DNH/CFH)

CAROLYN W. COLVIN, Acting Commissioner
of Social Security Administration,

                        Defendant.

_____

**APPEARANCES:**                         **OF COUNSEL:**

Legal Aid Society of Northeastern NY      MARY MARTHA WITHINGTON, ESQ.
112 Spring Street, Suite 109
Saratoga Springs, New York 12866
Attorneys for Plaintiff

Social Security Administration,           KRISTINA D. COHN, ESQ.
Office of Regional General Counsel,
Region II
26 Federal Plaza - Room 3904
New York, New York 10278
Attorneys for Defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

Plaintiff Kathy Sue Anthony ("plaintiff") brings this action pursuant to 42 U.S.C. §

405(g) seeking review of a decision by the Commissioner of Social Security

("Commissioner" or "defendant") denying her applications for supplemental security

income benefits ("SSI") and Disability Insurance Benefits ("DIB"). Plaintiff moves for a

_____

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28
U.S.C. § 636 (b) and N.D.N.Y.L.R. 72.3 (c).

finding of disability, and the Commissioner cross moves for a judgment on the pleadings. Dkt. Nos. 15, 16. For the following reasons, it is recommended that plaintiff's motion be granted and the matter be remanded to the Commissioner for further proceedings consistent with this Report-Recommendation and Order.

## I. **Background**

### A. **Procedural History**

Plaintiff, born on November 25, 1962, applied for SSI and SSDI benefits on September 2, 2010, alleging a disability onset date of April 1, 2007. Dkt. No. 9-5 at 2-7.[2] Those applications were denied on February 18, 2011. Dkt. No. 9-4, at 2-5. Plaintiff requested a hearing before an administrative law judge ("ALJ"), and a hearing was held on May 9, 2012 before ALJ Carl E. Stephan. Id. at 78.[3] A supplemental hearing was held on October 4, 2012, at which time vocational expert ("VE") Peter A. Manzi testified. Id. at 64-76.[4] In a decision dated October 23, 2012, the ALJ held that plaintiff was not entitled to disability benefits. Id. at 19-29. Plaintiff filed a timely

---

[2] Unless otherwise indicated, cites to page numbers refer to the pagination generated by CM/ECF, not the page numbers provided on the administrative transcript or by the parties in the individual documents.

[3] Plaintiff appeared for an initial hearing on February 15, 2012. Dkt. No. 9-2 at 104. The ALJ adjourned the hearing, determining that plaintiff needed to undergo consultative examinations before the hearing occurred. Id. at 106.

[4] A brief hearing was also held on February 15, 2012 to address plaintiff's failure to appear at certain consultative examinations. Id. at 104-108.

request for review,[5] and on May 12, 2014, the Appeals Council denied plaintiff's request, making the ALJ's findings the final decision of the Commissioner.  Dkt. No. 9-2 at 2-8.  This action followed.

## B. **Facts**[6]

Plaintiff is a high school graduate who attended college for one semester.  Dkt. No. 9-2 at 44.  Plaintiff is divorced and has three adult children.  Id. at 43; Dkt. No. 9-7 at 3, 61.  Plaintiff last worked in 2008 for one month for a distribution company, Fillpoint, LLC.  Dkt. No. 9-2 at 84.  Plaintiff states that she ended this employment because she "couldn't stand up . . . and do the work."  Id. at 84-85.  For approximately six months in 2007, plaintiff stocked shelves at a retail store, Ocean State Job Lots, where she worked part time, at four hours per week.  Id. at 85.  Before that, she worked part time as a "sub maker" at Blimpies, where she reports her supervisors "were very flexible about letting [her] sit down or rest . . . ."  Id. at 86.  For approximately eight months,

---

[5] In her request for review, plaintiff's counsel submitted additional evidence.  The Appeals Council considered evidence from Saratoga County Mental Health Center dated December 5, 2012 to February 8, 2013; evidence from Orthopedic Associates of Saratoga dated November 5, 2012 to February 11, 2012; and evidence from Galway Family Health, dated November 5, 2012 to February 11, 2013.  Dkt. No. 9-2 at 8.  The Appeals Council "found that this information does not provide a basis for changing the [ALJ's] decision," contending that "[t]he [ALJ] decided your case through October 23, 2014.  This is new information about a later time.  Therefore, it does not affect the decision about whether you were disabled beginning on or before October 23, 2012."  Id.  The Appeals Council made this evidence part of the record.  Dkt. No. 9-2 at 6; see also Dkt. No. 10 at 12 n. 18, 21 ("[p]laintiff submitted additional treatment records from Saratoga County Mental Health Center which included a screening assessment dated 12/05/2012 . . . .  These treatment records were not made a part of the administrative record.),("Additional treatment records from [Galway Family Health] covering the period of 8/17/12 and 2/11/13 were submitted to the Appeals Council for consideration but were not included in the administrative record.").

[6] This "facts" section is a recitation of plaintiff's testimony at the hearing and does not amount to findings of facts by this Court.

plaintiff worked six hours per day, five days per week[7] as a teacher's aide at The Crossings, a school for autistic children.  Id. at 49.  Plaintiff has held full-time employment as an activities worker at an "adult daycare company," assisting individuals who have Alzheimer's disease.  Id. at 50.

Plaintiff reported that she is an alcoholic who last drank alcohol in 1999.  Dkt. No. 9-2 at 86, 55.  She admitted to using marijuana when she was in college, but states she has not used the drug for "many" years.  Id.  Plaintiff last used cocaine over twenty-eight years ago.  Id. at 56.  Plaintiff denied "any problems" with abusing prescription drugs.  Id. at 87.  At the time of the October 4, 2012 hearing, plaintiff was attending a work preparation program at Unlimited Potential as part of her mental health treatment plan.  Id. at 45-46.  Plaintiff also went to Friendship House, "an intensive day treatment program," but had "a hard time making it through the day because of [her] back . . . [she] just can't sit up that long . . ."  Id. at 59, 102.[8]  At Friendship House, plaintiff saw Heather, a counselor, for formal visits every two weeks.  Id. at 61.

During the hearing, the ALJ asked plaintiff about apparent inconsistencies in the record regarding when she last used alcohol and drugs.  The ALJ noted that in a July 11, 2012 record from Friendship House, plaintiff reported that she was "15 months clean of substances other than opioids."  Id. at 56.  Plaintiff explained that she "believe[d] that [she] said [she] was 15 months sober and sober thinking is different

---

[7]  Plaintiff testified at the administrative hearing that her job at The Crossings as full time (Dkt. No. 9-2 at 50).  However, moments later, she testified that the position was part time.  Dkt. No. 9-2 at 48-49.

[8]  After completing a year of treatment with Saratoga County Alcohol and Substance Abuse Services, plaintiff was referred to Friendship House, which is affiliated with Saratoga County Mental Health Center.  Dkt. No. 9-2 at 59, 101.

than being clean" in that "[b]eing clean is not having any drugs in your body and being sober is thinking sober." Id. The ALJ pointed out that, in a report from consultative examiner Dr. Gina Scarano-Osika, PhD (Dkt. No. 9-8 at 205), plaintiff reported that she last used marijuana in January 2011, last used crack in 2006, and that Dr. Scarano-Osika felt that plaintiff "smelled heavily of alcohol." Id. at 56. Plaintiff told the ALJ that the report was "incorrect." Id. The ALJ also referenced office treatment records from Saratoga Alcohol and Substance Abuse Services, dated April 2011 (Dkt. No. 9-9 at 39), wherein plaintiff reported no alcohol use since 2003 and that she used marijuana two months prior. Id. at 57. Plaintiff reported that this was "not true." Id. When the ALJ asked plaintiff about a relapse in 2003 or 2004 (Dkt. No. 9-7 at 36), which was mentioned in records from Saratoga County Alcohol and Substance Abuse Services, she denied having such relapse. Id. at 101. The ALJ also asked plaintiff about the number of Driving While Intoxicated ("DWI") charges she had. Id. at 57-58. Plaintiff reported that she had two charges, but later reported three charges. Id. The ALJ asked plaintiff why a report from Saratoga County Alcohol and Substance Abuse Services stated that she had five DWIs or Driving While Ability Impaired ("DWAI"); plaintiff replied that her "memory issues are a problem." Id. at 58.

Plaintiff reported that what keeps her from working is her depression and finding a job that can "accommodate . . . the breaks in sitting or standing" because of her back, arthritis "through [her] whole body that's very painful," and pain in "all [her] joints." Dkt. No. 9-2 at 52. In order to manage her pain, plaintiff did "physical therapy at home," took pain medication, and was "learning . . . meditation and different methods of pain

management." Id. at 53.  Specifically, plaintiff took Lortab two times per day, which she

says helps with her pain, and Arthorotec, for arthritis, which also helps with her pain.  Id.

Plaintiff reported no side effects from the pain medications.  Id. at 53, 62.  Plaintiff took

Paxil for depression, Klonopin for her anxiety, and Flexeril for muscle spasms.  Id. at

61-62.  The Flexeril caused her to feel fatigued, as did her Hepatitis C.  Id. at 62, 98.

Plaintiff did not undergo any treatment for her Hepatitis.  Id. at 62.  Plaintiff reported

having a pinched nerve in her neck from "compensating," degenerative discs in her

"bottom lower two lumbar, 3 and 4," and right knee issues.  Id. at 63.  Plaintiff received

cortisone shots for her knee, but was not a candidate for knee replacement surgery.  Id.

When plaintiff stood for a half of an hour, it "feels like something going down the back

of your leg is burning sort of.  [Her] knees don't want to stand up that long either."  Id.

Plaintiff also had trouble sitting, and could sit for half of an hour to an hour at a time.  Id.

When plaintiff sat too long, she felt uncomfortable, her "feet start to go to sleep," and

she experienced pain in her "lower behind and the lower back area."  Id. at 64.  She

also experienced neck pain when she is sitting that radiated down her right shoulder to

her arm.  Id.

Discussing her symptoms of depression, plaintiff reported regularly experiencing

isolation, crying, "just staying in [her] room, not eating, not sleeping.  Dkt. No. 9-2 at 64,

93.  Plaintiff experienced these symptoms

> a couple of times a month[9] if [she is] on [her] meds properly.
> If [she] miss[es] a med or anything, it could be more than

---

[9]  Plaintiff also reported that such periods of depression occur four or five days per month.  Dkt.
No. 9-2 at 93.

> that. That's the last few months . . . but sometimes it gets so
> it's a couple times a week and then [she'll] have a couple of
> good weeks in a row . . . .

Id. at 64-65. Plaintiff explained that her anxiety is something that is "an everyday thing" for her. Id. at 93. She explained that "talking with people or a lot of people around" will trigger her anxiety, and that social settings are difficult for her. Id. at 93-94. Plaintiff testified that, although she goes to AA meetings, it took her a year to speak at a meeting. Id. at 94. When plaintiff feels anxious, she "sweat[s] a lot . . . and [has] trouble getting [her] thoughts together and [does not] communicate well." Id.

Plaintiff also discussed her physical limitations due to her neck and back pain, explaining that she "can't walk a long ways . . . sit a long time . . . stand a long time . . . ." Dkt. No. 9-2 at 95. Further, plaintiff stated that she could only be on her feet for fifteen minutes before feeling uncomfortable. Id. at 96. When she needs to take a break, she will sit and rest for five or ten minutes and then she can get back up again. Id. Plaintiff can also only sit for about fifteen minutes before needing to change her position. Id. Plaintiff is also limited as to what she can lift and carry. Id. She reported that she can carry a purse, but cannot carry a grocery bag or lift her twenty- to thirty-pound, three-year-old grandson. Id. at 96. To address her back and neck pain, plaintiff performs home exercises and goes to physical therapy when she has "a flare-up." Id. at 97. Plaintiff's pain in her lower back is what keeps her from "get[ting] around." Id. at 94. Her back pain "shoots down the back of [her] right leg." Id. at 95. Plaintiff wakes up with a pain level of six on a scale ranging from one to ten. Id. On a "normal day," plaintiff ices her legs twice, uses heat, and completes her therapy exercises. Id.

Addressing her daily activities, plaintiff explained that, because of her symptoms, she does not "have nearly as many [daily activities] as [she] used to." Dkt. No. 9-2 at 65. During the day, "if [she is] not going to Friendship house, [she is] usually reading[,]" or she will do crafts, such as drawing and painting, but she can no longer make jewelry because of arthritis in her hands. Id. at 65, 99. Plaintiff also enjoys gardening, but she can only care for her plants on a table because she "can't get down in the ground." Id. at 99. Plaintiff goes to Alcoholics Anonymous ("AA") meetings two to three times per week. Id. Sometimes plaintiff gets dinner with friends from AA and goes to social events, such as dances. Id. Plaintiff is able to maintain her own hygiene, though she noted that, on four or five days per month, she either does not feel like she can or does not want to get out of bed and she will let her hygiene "slide a little." Id. at 65, 92-93. Id. at 65. She does household chores, but does them slowly and has to take sitting breaks. Id. A neighbor mopped her floors for her. Id.

## II. **Discussion**

### A. **Standard of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. See Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson

v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).

"In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision." Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. See Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998). If the Commissioner's finding is supported by substantial evidence, it is conclusive. 42 U.S.C. § 405(g), as amended; Halloran, 362 F.3d at 31.

## B. **Determination of Disability**[10]

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ." 42 U.S.C. § 423(a)(1) (2004). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A). A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be

---

[10] Although the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably." Donato v. Sec 'y of Health and Human Servs., 721 F.2d 414, 418 n.3 (2d Cir.1983) (citation omitted).

available to him or her based upon age, education, and work experience.  Id. §
423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical
and laboratory diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the
impairment is "based [upon] objective medical facts, diagnoses or medical opinions
inferable from [the] facts, subjective complaints of pain or disability, and educational
background, age, and work experience."  Ventura v. Barnhart, No. 04-CV-9018 (NRB),
2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d
1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based upon 20 C.F.R. §
404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers
> whether the claimant has a 'severe impairment' which
> significantly limits his [or her] physical or mental ability to do
> basic work activities.
>
> If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has
> an impairment which is listed in Appendix 1 of the regulations.
> If the claimant has such an impairment, the [Commissioner]
> will consider him [or her] disabled without considering
> vocational factors such as age, education, and work
> experience; the [Commissioner] presumes that a claimant who
> is afflicted with a 'listed' impairment is unable to perform
> substantial gainful activity.
>
> Assuming the claimant does not have a listed impairment, the
> fourth inquiry is whether, despite the claimant's severe
> impairment, he [or she] has the residual functional capacity to
> perform his [or her] past work.
>
> Finally, if the claimant is unable to perform his [or her] past

> work, the [Commissioner] then determines whether there is
> other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added).  The plaintiff bears the initial burden of proof to

establish each of the first four steps.  DeChirico v. Callahan, 134 F.3d 1177, 1179-80

(2d Cir. 1998) (citing Berry, 675 F.2d at 467).  If the inquiry progresses to the fifth step,

the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in

gainful employment somewhere.  Id. at 1180 (citing Berry, 675 F.2d at 467).

### C. **ALJ Determination**

Using the five-step disability sequential evaluation, the ALJ found that plaintiff

met the insured status requirements of the SSA through March 31, 2012, and had not

engaged in substantial gainful activity since April 1, 2007, the alleged onset date.  Dkt.

No. 9-2 at 21.  At step two, the ALJ concluded that plaintiff had the following severe

impairments: neck impairments, lower back impairments, bilateral knee impairments,

right shoulder impairments, drug and alcohol addiction, post-traumatic stress disorder,

and dysthymic disorder.  Id. at 22.  At step three, the ALJ concluded that plaintiff did not

have an impairment, alone or in combination, sufficient to meet the listed impairments

in Appendix 1, Subpart P of Social Security Regulation Part 404p, Appx. 1.  Id. at 23.

Before reaching step four, the ALJ concluded that plaintiff has the residual functional

capacity

> to perform light work as defined in 20 CFR 404.1567(b) and
> 416.967(b) except for an inability to lift or carry more than 10
> pounds frequently or 20 pounds occasionally, stand or walk
> for more than three hours each total in an eight-hour
> workday, sit for more [sic] six hours total in an eight-hour

11

> workday, with a need to be able to change position every 60
> minutes; no climbing up ladders or scaffolds, only occasional
> stair/ramp climbing, crouching, stooping, crawling, balancing,
> or kneeling, and use of the right dominant upper extremity
> limited to only occasional reaching, pushing, or pulling in all
> directions; with no work at unprotected heights and only
> occasional work around mechanical parts, moving motor
> vehicles, and extremes of humidity, dust, temperature, and
> vibrations; with ability to meet the mental demands of only
> simple unskilled work involving simple work related decisions
> with an occasional ability to make complex decisions and
> perform complex work tasks and only occasional interaction
> with other people.

Id. at 24-25.  The ALJ opined that this RFC is

> supported by the minimal objective findings, the
> observations at the examinations, [h]er ability to move about
> and meet her personal needs without assistance or an
> assistive device, her substance abuse history giving
> secondary motivation to exaggerate pain, and her utter lack
> of credibility in testimony regarding issues like substance
> abuse, her lack of motivation, and the opinions of the
> examining physicians.

Id. at 27.  The ALJ determined that plaintiff is unable to perform any past work.  Id. at

27-28.  Next, the ALJ concluded that plaintiff can perform jobs that exist in significant

numbers in the national economy.  Id. at 28.  Thus, the ALJ determined that plaintiff

was not disabled.  Id. at 10.


### D.  **Vocational Expert**

The vocational expert testified that plaintiff had no transferrable skills from her

prior work history.  Dkt. No. 9-2. at 68.  In the first hypothetical presented to the VE, the

ALJ asked the VE to assume that the individual, with the same education and work

experience as plaintiff, could lift and carry at the light exertional level, "20 pounds

occasionally/20[11] pounds frequently"; stand for three hours out of an eight-hour day; walk for three hours; sit for six hours; and do each above activity for sixty minutes at one time before "briefly needing to change positions." Id. at 69. Further, the ALJ provided that the individual would be "precluded from climbing ladders, scaffolding, . . . can only climb stairs, ramps, stoop, crouch, crawl, balance, or kneel[,"] and "is limited with the right upper extremity, that is the dominant upper extremity, pushing and pulling occasionally in all directions." Id. The ALJ also provided that the individual "[c]annot work around unprotected heights; can occasionally work around moving mechanical parts, motor vehicle operation; occasionally work around humidity and wetness; can occasionally be exposed to dusts, odors, fumes, and pulmonary irritations; and only occasionally be exposed to extremes in temperature and vibrations." Id. at 69-70. Finally, the ALJ provided that the individual "would be capable of doing simple, unskilled work" making "only . . . simple work-related decisions, however, can occasionally do more complex work and just occasionally make more complex decisions and where there is only occasional interaction with other individuals." Dkt. No. 9-2 at 70.

The VE concluded that such an individual could not perform plaintiff's past work. Dkt. No. 9-2 at 70. However, the VE determined that such individual could perform

---

[11] The ALJ proposed to the VE a hypothetical wherein the claimant could lift and carry at the light exertional level and provided that such level is "20 pounds occasionally/20 pounds frequently." Dkt. No. 9-2 at 69. It appears to the undersigned that the ALJ misspoke and intended to say twenty pounds occasionally and ten pounds frequently, as reflected in the light exertional level. See 20 C.F.R. § 416.967(b). Regardless, as will be addressed below, the ALJ limited plaintiff's RFC to lifting twenty pounds occasionally and no more than ten pounds frequently. Id. at 25.

light, unskilled work, including the roles of photocopy machine operator,[12] collator operator,[13] and laundry sorter.  Id. at 70-71.  The VE explained that the laundry sorter position had occasional pushing and pulling that "wouldn't be more than a third of a day."  Id. at 71-72.  The ALJ inquired whether the pushing and pulling required of the position "could be up to a third of a day," and if the individual could perform the job of laundry sorter if she could perform pushing or pulling "even occasionally, but only infrequently."  Id. at 72.  The ALJ concluded that, under such limitations, the hypothetical claimant could not perform the laundry sorter position.  Id.  Addressing the ALJ's question whether a person who could perform pushing or pulling occasionally, but infrequently, could perform the collator operator role, the VE concluded that such a person may not be able to perform some collator operator roles that tended to require additional pushing or pulling.  Id. at 72-73.  Finally, addressing whether a person who could perform pushing or pulling occasionally, but infrequently, could perform the photocopy machine operator position, the VE concluded that such a person could perform the role if "the total standing and walking is six hours."  Id. at 73.

The ALJ then presented a second hypothetical, where "the individual is capable of sitting six hours, standing for two, walking for two, and can do each of those for 30 minutes at one time before needing to change positions[,]" with the same lifting and carrying limitations as the first hypothetical, and all other limitations the same.  Dkt. No.

_____

[12]  The VE explained that this position is defined as light, "could be performed half sitting and half standing, alternating between those two positions"; "frequent reaching, handling, and fingering . . . pushing and pulling . . . less than occasional."  Dkt. No. 9-2 at 70.

[13]  The VE stated that "the collator operator [position] would be the same as the laundry sorter [position] and would have occasional pushing and pulling.  Dkt. No. 9-2 at 70.

9-2 at 75.  The VE explained that the additional limitations in the second hypothetical "would knock out those jobs" mentioned as available in the first hypothetical.  Id. at 74. The VE proposed that the claimant in the second hypothetical would be limited to sedentary, unskilled jobs, and could perform the work of an addresser, table worker, and surveillance system monitor.  Id.  When asked if the individual in the second hypothetical could perform sedentary jobs if she were unable to sit for six hours and could sit only for two hours per day, the VE reported that "there'd be no work for somebody with just six hours' worth of work."  Id.  The VE specified that the addresser position requires frequent reaching, handling, and fingering.  Id. at 76.  If the individual in the second hypothetical were unable to perform such tasks occasionally, the VE reported she would be incapable of completing the tasks required of an addresser or of a table worker.  Id. at 75-76.

### E. **Medical Examiners**

Plaintiff underwent a psychiatric consultative examination performed by Dr. Neil Berger.  Dkt. No. 9-9 at 61-68.  Dr. Berger noted plaintiff's diagnoses as: Dysthymic disorder, NOS; PTSD; anxiety disorder, NOS,; Alcohol Abuse; Cocaine abuse; Opioid abuse; and cannabis abuse.  Id. at 64.  Dr. Berger's prognosis of plaintiff was "fair given the above services."  Id. at 65.  Dr. Berger noted that plaintiff's thought processes were coherent and goal directed, her affect was anxious, her mood was dysthymic, her sensorium was clear, and she was "oriented by 3."  Id. at 63.  Plaintiff's attention and concentration were intact; her recent and remote memory skills were "more or less

intact," with plaintiff recalling three of three objects immediately, two of three after five minutes, and six digits forward and three backward.  Id.  Dr. Berger assessed plaintiff's insight and judgment as fair.  Id. at 64.  Dr. Berger concluded that plaintiff could follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, keep a regular schedule, learn new tasks, perform complex tasks independently, and make appropriate decisions.  Id.  However, Dr. Berger determined that plaintiff could not relate adequately with others or appropriately deal with stress.  Id.  He opined that "[t]hese are caused by fatigue and a lack of motivation."  Id.  Dr. Berger concluded that the results of the examination "appear to be consistent with psychiatric problems and this may significantly interfere with the claimant's ability to function on a daily basis."  Id.

Dr. Berger found that plaintiff had mild limitations in her ability to understand and remember complex instructions; carry out complex instructions; make judgments on work-related decisions; interact appropriately with the public, supervisors, and coworkers; and respond appropriately to usual work situations and changes in the routine work setting.  Dkt. No. 9-9 at 66-67.  Dr. Berger noted that plaintiff had "memory issues and distractibility," a lack of motivation and focus, and poor retention.  Id. at 66. He further noted that plaintiff suffered from depression, "withdrawal from and avoidance of interpersonal interactions.  Lack of focus."  Id.  at 67.  Dr. Berger noted no other limitations.

Plaintiff underwent a psychological consultative examination by Dr. Gina Scarano-Osika, PhD.  Dr. Scarano-Osika reported that plaintiff was "logical and

16

coherent, but her insight and judgment were very limited." Dkt. No. 9-8 at 206. Plaintiff was able to recall three of three objects immediately and after a five-minute delay. Id. She was able "to attend and concentrate to numerical digits up to five in length"; retrieve information and word meanings at an average level; and complete word problems requiring addition, subtraction, multiplication, and division without error. Id. Dr. Scarano-Osika diagnosed plaintiff with polysubstance dependence; antisocial personality disorder; and bulging disc, knee, and rotator cuff pain. Id. Dr. Scarano-Osika noted concern about plaintiff's use of pain medications and recommended that plaintiff "obtain imaging studies and objective test results rather than [plaintiff]'s self-reported level of pain." Id. at 27. Dr. Scarano-Osika assessed no limitations so long as plaintiff "is clean and sober." Id. at 28-29.[14] The ALJ assigned great weight to Dr. Scarano-Osika's opinion insofar as it related to plaintiff's mental capacity to work, but noted that, in making a severity determination, he gave greater weight to the findings of Dr. Berger because Scarano-Osika's "examination observations may have been affected by the claimant's having apparently been under the influence of alcohol during the examination." Id. at 22, 27.

Plaintiff underwent a physical consultative examination performed by William R. Rogers, M.D. on March 7, 2012. Dr. Rogers noted that plaintiff's spine revealed normal symmetry with tenderness at the cervical-thoracic junction in the midline and tenderness at the right trapezius and right upper rhomboids. Dkt. No. 9-8 at 195.

---

[14] Plaintiff's counsel objected to Dr. Scarano-Osika's examination, stating that she focused too exclusively on plaintiff's substance use/dependence. See Dkt. No. 9-2 at 41-42.

There was mild tenderness observed in the lumbrosacaral midline.  Id.  Plaintiff had a cervical spine rotation range of motion of forty-five degrees bilaterally, forty degrees flexion and extension, and forty degrees of right and left lateral flexion.  Id.  Dr. Rogers noted that plaintiff had full range of motion in all of her other upper extremities, including her right shoulder.  Id.  Plaintiff had some tenderness in her right AC joint, but could flex and abduct 180 degrees and had 80 degrees of internal and external rotation.  Id.  Dr. Rogers observed very minimal discomfort "at the extremes of overhead movements."  Id.  Plaintiff had seventy degrees flexion, twenty degrees extension, and forty five degrees of right and left lateral flexion in her lumbar spine.  Id.  Straight leg raises induced plaintiff to have low back pain radiating at fifty degrees on the right.  Id.  Plaintiff had normal symmetrical gait.  Id.  She could extend both knees fully and flex to 140 degrees without discomfort.  Id.  There was no effusion, joint line tenderness, or crepitus in either knee.  Id.  Plaintiff could get off and on the exam table without assistance.  Id.  "Motor exam reveals 4-1/2 [out of] 5 weakness in right biceps, triceps, and grip, but all other motor groups testing is 5 [out of] 5.  Sensation to light touch is mildly decreased in the right fourth and fifth fingers and otherwise in tact."  Id. at 195-96.

Dr. Rogers diagnosed plaintiff with cervical spine degenerative disc disease and lumbar spine degenerative disc disease, based on his review of plaintiff's records.  Dkt. No. 9-8 at 196.  Further, he noted degenerative changes to the right acromioclavicular joint, bilateral knee artharlgias-normal on exam, and status post right ulnar knee transposition.  Id.  He opined that plaintiff could lift or carry up to ten pounds

18

occasionally; up to twenty pounds infrequently, which he marked as less than occasionally, but greater than never; and that she could never lift or carry more than twenty pounds. Id. at 197. Dr. Rogers further determined that plaintiff could sit, stand, or walk for thirty minutes at one time without interruption. Id. at 198. She could sit, stand, and walk for three hours each in an eight-hour work day. Id. Dr. Rogers also concluded that plaintiff could reach overhead, reach, and push and pull occasionally, and handle, finger, and feel with both hands frequently. Id. Plaintiff could occasionally operate foot controls with both feet. Id. Further, Dr. Rogers concluded that plaintiff could never climb ladders or scaffolds, but could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl. Id. at 200. Plaintiff could never work at unprotected heights, but could occasionally work with moving mechanical parts; operate a motor vehicle; work around humidity; wetness; dust; odors; fumes; pulmonary irritants; and extreme cold or heat. Id. at 201. The ALJ gave "some lesser weight" to Dr. Roger's opinion regarding plaintiff's lifting and carrying abilities because "Dr. Rogers had very limited abnormal examination findings, and did not have an opportunity to review all of the other treatment and examination records." Dkt. No. 9-2 at 27.

Plaintiff's primary care physician, Anneke Pribis, M.D., listed plaintiff's medical conditions as chronic low back pain, stable; depression, stable; anxiety, stable/guarded; and alcoholism, in remission, excellent prognosis. Dkt. No. 9-6 at 195. Dr. Pribis provided an assessment of plaintiff's functional limitations. Id. at 196. Dr. Pribis concluded that plaintiff (1) had no limitations in using her hands; (2) was moderately limited in: walking, standing, sitting, using stairs or climbing; understanding,

remembering, and carrying out instructions; maintaining attention and concentration; making simple decisions; interacting appropriately with others; maintaining socially-appropriate behavior without behavioral extremes; and functioning in a work setting in a consistent pace; and (3) very limited in lifting, carrying, pushing, pulling, and bending. Id. Dr. Pribis recommended a lifting limit of twenty pounds occasionally and ten pounds frequently, with an additional limitation to avoid high stress/high paced jobs. Id. In treatment records, Dr. Pribis noted that plaintiff's "[r]ange of motion in neck is definitely diminished in both flexion as well as rotation," Dkt. No. 9-9 at 7 (exam on 11/23/11), and that examination of plaintiff's knee "is notable for an effusion that is moderate in size, range of motion is slightly diminished, [plaintiff] is tender along the joint lines, no redness or warmth." Id. at 8 (exam on 10/6/11). Dr. Pribis also observed that "range of motion in the lower back is slightly diminished as is the neck." Id. at 18 (exam on 4/25/11). Dr. Pribis described plaintiff's "chronic low back pain" as "permanent" and "stable." Dkt. No. 9-6 at 195. The ALJ did not discuss the weight he afforded to Dr. Pribis' assessment or treatment records.

## F. **Analysis**

Plaintiff argues that the ALJ committed reversible error in: (1) failing to give appropriate weight to plaintiff's subjective complaints regarding her neck, back, and joint pain; (2) failing to (a) consider plaintiff's depression, attention deficit hyperactivity

disorder ("ADHD") or Attention Deficit Disorder ("ADD"),[15] panic and anxiety disorders, and traumatic brain injury, as severe impairments, and (b) consider these impairments in combination with one another; and (3) concluding that plaintiff had the residual functional capacity ("RFC") to perform light work.  Finally, plaintiff argues that the ALJ's decision is against the weight of the evidence.  See Dkt. No. 10.

## 1.  **Subjective Complaints of Pain**

Plaintiff argues that the ALJ erred in assessing her complaints of pain insofar as he (1) "found plaintiff's testimony and reports to her providers as incredible," due to plaintiff's apparently inconsistent reporting of her alcohol and drug use, (2) "failed to elicit details at the hearing of how plaintiff's allegations of pain limit her activities of daily living and . . . the particular nature of plaintiff's daily activities," and (3) failed to assess certain medical evidence "which would support a finding of disability by . . . dismissing plaintiff's recounting of her symptoms as not credible."  Dkt. No. 10 at 16.

When the evidence demonstrates a medically-determinable impairment, "subjective pain may serve as the basis for establishing disability, even if such pain is unaccompanied by positive clinical findings or other 'objective' medical evidence[.]"  Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).  "Objective medical evidence is evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm,

---

[15]  Plaintiff's counsel states that the ALJ erred in failing to consider plaintiff's Attention Deficit Disorder, and, one paragraph later, referred to plaintiff's condition as Attention Deficit Hyperactivity Disorder.  Dkt. No. 10 at 19.  It is unclear to the undersigned from which of these conditions plaintiff is claiming to suffer.

sensory deficit or motor disruption." Casino-Ortiz v. Astrue, 06-CV-155 (DAB/JCF), 2007 WL 2745704, at *11, n.21 (S.D.N.Y. 2007) (citing 20 C.F.R. § 404.1529(c)(2)). However,

> [a]n administrative law judge may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.

Lewis v. Apfel, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (internal citations omitted).

The claimant's credibility and motivation, as well as the medical evidence of impairment, are used to evaluate the true extent of the alleged pain and the degree to which it hampers the plaintiff's ability to engage in substantial gainful employment. See Marcus, 615 F.2d at 27. Where an ALJ determines that a plaintiff's complaints of pain are unsupported by objective medical evidence, the ALJ must then consider several factors pursuant to 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3):

> (i)  [The claimant's] daily activities;
>
> (ii)  The location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv)  The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;
>
> (vi) Any measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on [his]

22

back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) (2003).  An ALJ's failure to explicitly address each of the credibility factors in the decision does not warrant a remand where the bases for the ALJ's decision can be gleaned from the record.  See Cichocki v. Astrue, 534 F. App'x. 71, 76 (2d Cir. 2013) (Summary Order).

However, "disability requires more than mere inability to work without pain." Dumas v. Schweiker, 712 F.2d 1545, 1552 (2d Cir. 1983).  Pain is a subjective concept, "difficult to prove, yet equally difficult to disprove[,]" and courts should be reluctant to constrain the Commissioner's ability to evaluate pain.  Id.  In the event there is "conflicting evidence about a [claimant's] pain, the ALJ must make credibility findings." Snell, 177 F.3d at 135 (citing Donato, 721 F.2d at 418-19).  Thus, the ALJ may reject the claims of disabling pain so long as the ALJ's decision is supported by substantial evidence.  Aponte v. Sec'y, Dep't of Health and Human Svcs. of U.S., 728 F.2d 588, 591 (2d Cir. 1984).  In making this determination, "[t]he issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of his symptoms are consistent with the objective medical and other evidence." Saxon v. Astrue, 781 F. Supp. 2d 92, 105 (N.D.N.Y. Mar. 4, 2011) (citing SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996)).  A claimant's credibility determination "must include the entire case record, objective medical evidence, the individual's owns

statements about symptoms, statements provided by treating or examining physicians or psychologists, and other persons about the symptoms and how the effect the claimant, and any other relevant evidence in the case record." Arrington v. Astrue, No. 09-CV-870, 2011 WL 3844172, at *13 (W.D.N.Y. Aug. 8, 2011) (citing SSR 96-7p, 1996 WL 374186, at *4).  That the ALJ "has the benefit of directly observing a claimant's demeanor and other indica of credibility . . . entitles the ALJ's credibility assessment to deference."  Schlichting v. Astrue, 11 F. Supp. 3d 190 (N.D.N.Y. 2012) (quoting Tejada v. Apfel, 167 F.3d 770, 770 (2d Cir. 1999)).

An ALJ may properly rely on inconsistencies within a claimant's statements in finding that a claimant is not credible or in lessening the credibility he or she assigns to such statements.  S.S.R. 96-7p, 1996 WL 374186, at *5 ("One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record."); see also 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii); Edel v. Astrue, No. 6:06-CV-0440, (LEK/VEB), 2009 WL 890667, at *17 (N.D.N.Y. Mar. 30, 2009) (quoting Roy v. Massanari, No. 3:01-CV-306, 2002 WL 32502101, at *2-3 (D. Conn. June 12, 2002) (upholding the ALJ's conclusion that the claimant was not entirely credible "in part, on discrepant reports as to alcohol consumption").  Moreover, various courts, including this one, have held that "[a] claimant's misuse of medications is a valid factor in an ALJ's credibility determinations."  Metz v. Astrue, No. 06-CV-1509, 2010 WL 2243343, *14 (N.D.N.Y. Apr. 21, 2010) (citing cases), adopted by No. 1:06-CV-1509, 2010 WL 2243347 (N.D.N.Y. May 31, 2010); see also Arrington, 2011 WL 3844172, at *13 (holding that, although the ALJ may consider a claimant's criminal history and

substance abuse as factors in assessing the claimant's credibility, they cannot be the only factors considered).

Here, the ALJ concluded that plaintiff's medically-determinable impairments reasonably could be expected to cause the alleged symptoms, but plaintiff's statements regarding the intensity, persistence, and limiting effects of the symptoms "are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." Dkt. No. 9-2 at 26. Further, the ALJ found plaintiff's testimony as to her pain to be "out of proportion to medical evidence and ultimately not credible." Dkt. No. 9-2 at 26. The ALJ observed that plaintiff's "history of substance abuse gives her an obvious secondary motivation to exaggerate pain in order to obtain narcotic pain medication." Id.

Moreover, there is evidence of inconsistency relating to plaintiff's substance abuse. Plaintiff reported last drinking alcohol in 1999, last using marijuana "a very long time ago . . . before '99," and last using cocaine before her daughter was born, twenty-eight years ago, but there is evidence in the record of an alcohol relapse in 2003 or 2004, use of marijuana as recent as 2011, and cocaine as recently as 2006. Dkt. No. 9-2 at 55; Dkt. No. 9-8 at 205. Further, a consultative examiner and plaintiff's primary care provider suggested that plaintiff smelled of alcohol during visits. Dkt. No. 9-7 at 119. Further, there is evidence of drug seeking-behavior -- several medical providers indicated concern that plaintiff was abusing her prescribed narcotic medications, and records indicate that plaintiff told providers that she had been abusing her Hydrocodone. Dkt. No. 9-7 at 121-30, 207, 213, 228; Dkt. No. 9-8 at 16, 21, 39; Dkt.

No. 9-9 at 52.  Due to plaintiff's inconsistently reporting her substance abuse, the ALJ concluded that plaintiff "is not a reliable source for information about when she last used drugs or alcohol.  Her utter lack of consistency story [sic] in this tends to undermine her overall credibility."  Dkt. No. 9-2 at 26.  Ultimately, the ALJ "found [plaintiff's] testimony to be out of proportion to medical evidence and ultimately not credible."  Id. at 26.  He further found plaintiff's statements of pain to be inconsistent with her activities of daily living, "the minimal nature of the objective findings," "unremarkable physical examination findings," and the "conservative nature of the treatment" she receives, as well as her activities of daily living.  Id.

Although the ALJ may appropriately consider inconsistencies in the record regarding plaintiff's last drug or alcohol use, as well as drug-seeking behaviors, the ALJ did not rely exclusively on plaintiff's inconsistency in reporting her drug and alcohol use in assessing her credibility.  Contrary to plaintiff's argument (Dkt. No. 10 at 17), the ALJ properly considered plaintiff's activities of daily living and the impact of plaintiff's pain on said activities.  The ALJ observed that plaintiff is able to do household chores, but slowly, and with breaks, and that a neighbor helps with mopping.  Dkt. No. 9-2 at 25.  The ALJ further noted that plaintiff is able to: groom, dress, and bathe herself without assistance; cook; use public transportation; and attend therapy groups.  Id. at 24.

Further, the ALJ reviewed plaintiff's complaints of pain in detail.  He assessed plaintiff's testimony that she has back, neck, and knee problems, and that they are more severe on her right side.  Id. at 25.  He also noted plaintiff's testimony that she can stand for only thirty minutes at a time and sit for only thirty to sixty minutes at a

26

time.  Id.  He noted that plaintiff reported her back pain radiates to her buttocks and her neck pain radiates to her right shoulder and her arms.  Id.  Further, the ALJ reviewed the record evidence relating to plaintiff's back, neck, and knee pain.  He observed that: (1) X-rays of plaintiff's lumbar spine indicate degenerative restroloisthesis at the L3-L4 level, (2) plaintiff underwent arthrosporic surgery on her right knee, (3) X-rays of plaintiff's right knee show internal derangement of the right knee joint, and plaintiff has received injections for right knee pain, and (4) plaintiff takes pain medication for left knee pain.  Dkt. No. 9-2 at 22.  The ALJ also reviewed consultative examiner William Rogers, M.D.'s findings that plaintiff has a decreased range of motion in the cervical spine, "positive straight leg raise on the right at 50°," and mild tenderness at the lumbar spine, but that there were no sensory or motor abnormalities noted.  Id. at 23.  The ALJ further reviewed Dr. William's findings that examination of plaintiff's knees "revealed essentially no abnormalities," with "normal range of motion in the knees bilaterally with no crepitis, instability, join [sic] line tenderness, or effusion," and no reported trigger point tenderness.  Id.  "Despite this relatively normal examination," the ALJ "accept[ed] that [plaintiff] has a medically determinable severe combination of orthopedic impairments including knee, lower back, neck and right shoulder impairments."  Id.

Thus, in determining that plaintiff's complaints of pain were entitled to little weight, the ALJ did not rely entirely on plaintiff's inconsistency in her statements regarding her drug and alcohol use nor her possible drug-seeking behavior.  Instead, the determination clearly considered plaintiff's "relatively unremarkable physical examination findings, the conservative nature of the treatment . . . , and the fact that

[plaintiff] is essentially able to engage in normal range of daily activities . . . ." Dkt. No. 9-2 at 25-27.[16] Accordingly, the ALJ's credibility finding is supported by substantial evidence.[17]

## 2. **Step two: severity**

Plaintiff argues that the ALJ committed reversible error insofar as he gave "little to no consideration" to plaintiff's alleged depression; posttraumatic stress disorder ("PTSD"); ADD/ADHD; anxiety; panic disorder; traumatic brain injury; and fatigue from Hepatitis C, fibromyalgia, sleep disturbance, or a medication side effect. Dkt. No. 10 at 10. She further contends that the ALJ erred by failing to conclude that such were severe impairments. Dkt. No. 10 at 19. Finally, plaintiff argues that the ALJ improperly failed to consider the combined effect of plaintiff's impairments. Id.

As noted, step two of the sequential evaluation process requires a determination

---

[16] Although the ALJ used this boilerplate language, he did not rely solely on this justification in making his credibility finding. See Jackson v. Colvin, 13-CV-5655, 2014 WL 4695080, at *21 n.7 (S.D.N.Y. Sept. 3, 2014) (noting that the ALJ rejected the plaintiff's complaints of pain "to the extent they were inconsistent with the above residual functional capacity assessment," but concluding that such language was not in error because the ALJ did not rely solely on this basis, and noting that the Seventh Circuit has held that such language is inconsistent with SSR 96-7p); see also Sink v. Colvin, 12-CV-239, 2015 WL 3604655, at *22 (W.D.N.Y. June 8, 2015) (noting that, even where an ALJ uses boilerplate language regarding credibility and its inconsistency with the RFC, "remand is not granted where it is apparent that the proper legal standard was applied, but the boilerplate was recited.") (citation omitted).

[17] Plaintiff suggests that consideration of her history of substance abuse is not relevant unless the ALJ is concluding that drug or alcohol abuse is "a material factor." Dkt. No. 10 at 17. In making this statement, it appears plaintiff is referring to case law that indicates that a person cannot be considered disabled "if alcoholism or drug abuse if alcoholism or drug addiction would ... be a contributing factor material to the Commissioner's determination that the individual is disabled." Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 123 (2d Cir. 2012) (citing 20 C.F.R. § 416.935(a)). To the extent that the undersigned has properly interpreted the plaintiff's statement, it appears that she misunderstands this standard. Although the ALJ did not find the plaintiff disabled, a finding of disability is not necessary for an ALJ to consider a claimant's drug or alcohol abuse and inconsistencies in reporting in rendering a credibility determination. See, e.g., Metz, 2010 WL 2243343, at *14.

whether the claimant has a severe impairment which significantly limits her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a) (2003). Where a claimant alleges multiple impairments, a court will consider "the combined effect of all [] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." Id. § 404.1523. An impairment, or combination thereof, is not severe if it does not impinge on one's "abilities and aptitudes necessary to do most jobs." Id. § 404.1521. Basic work activities which are relevant for evaluating the severity of a physical impairment include "physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling . . . ." Id. § 404.1521(b)(1).

When a claimant alleges a mental impairment, the ALJ is required to engage in a "special technique" at step two of the sequential analysis, set forth in 20 C.F.R. §§ 404.1520a(b)-(e), 416.920a(b)-(e), 416.920a(b)-(e). See Showers v. Colvin, 13-CV-1147 (GLS/ESH), 2015 WL 1383819, at *4 (N.D.N.Y. Mar. 25, 2015) (citing Kohler v. Astrue, 546 F.3d 250, 265-66 (2d Cir. 2008). This technique "helps administrative judges determine at Step 2 of the sequential evaluation whether claimants have medically-determinable mental impairments and whether such impairments are severe." Showers, 2015 WL 1383819, at *4. Thus, under this technique, an ALJ is to assess the "functional effects of mental impairments . . . . Administrative law judges assessing residual functional capacity 'cannot simply rely on the limitations articulated in the severity analysis . . . , but must instead provide a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B

29

and C of the adult mental disorders listings in 12.00 of the Listing of Impairments." Id. (quoting Ladue v. Astrue, No. 12-CV-600 (GLS), 2013 WL 421508, at *3 n.2 (N.D.N.Y. Feb. 1, 2013) (additional internal quotation marks and emphasis omitted).

A plaintiff contesting the disability determination bears the burden of establishing that she has a "severe impairment," which is defined as "any impairment or combination of impairments which significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(C). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including "[u]nderstanding, carrying out, and remembering simple instructions; [and][u]se of judgment." 20 C.F.R. § 416.921(b)(2)-(3). "The 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, itself, sufficient to deem a condition severe." Bergeron v. Astrue, No. 09-CV-1219, 2011 WL 6255372, at *3 (N.D.N.Y. Dec. 14, 2011) (quoting McConnell v. Astrue, No. 6:03-CV-0521, 2008 WL 833968, at *2 (N.D.N.Y. Mar. 27, 2008)). Thus, when "medical evidence establishes only a slight abnormality or a combination of slight abnormalities," a finding of "not severe" is warranted. SSR 85-28, 1985 WL 56856, at *3 (S.S.R. 1985); see 20 C.F.R. § 416.921(a). Therefore, de minimis claims may be screened out at step two of the sequential evaluation. See Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995).

"The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability." DeChirico, 134 F.3d at 1180; see also 20 C.F.R. § 404.1520(d) (2003); Id. at pt. 404, subpt. P. Appx. 1 (2003) (listing per se disabling ailments). Additionally, the regulations state that

"if an individual has an impairment that is 'equal to' a listed impairment," that individual is disabled regardless of his or her age, education, or work experience.  DeChirico, 134 F.3d at 1180 (quoting 20 C.F.R. § 404.1520(d) (2003)).

### a. **Fatigue**

Plaintiff first contends that the ALJ did not properly consider her complaints of fatigue secondary to her fibromyalgia,[18] Hepatitis C, "sleep disturbance" and pain medication.  Dkt. No. 10 at 19.  The ALJ noted plaintiff's fibromyalgia and Hepatitis C diagnoses, but did not address plaintiff's claims of fatigue directly.  Plaintiff's medical records provide that she had complained to medical providers of fatigue or being unable to sleep through the night.  Dkt. No. 9-7 at 15, 89, 118-21.  Further, plaintiff testified that the medication she takes for muscle spasms, Flexeril, and her Hepatitis C caused her "a lot of fatigue."  Dkt. No. 9-2 at 62.  Medical records from 2008 and 2012 provide that plaintiff was receiving Ambien or Seroquel to help with her inability to sleep through the night.  Dkt. No. 9-7 at 118-21, 215; Dkt. No. 9-9 at 23, 61.  Plaintiff did not report that, at the time of the hearing, she was taking Ambien or any other medication to help her sleep.  In a consultative examination, plaintiff reported getting eight to ten hours of sleep per night.  Dkt. No. 9-8 at 206.

Although plaintiff noted that she experienced fatigue, she did not indicate that fatigue interfered with her daily activities.  Despite plaintiff's fatigue, she was able to

---

[18]  Plaintiff does not argue that the ALJ erred in determining that her fibromyalgia was not a severe impairment.

cook, clean, attend AA meetings, attend social functions, tend to her herb garden, and go to dinner with AA friends. Dkt. No. 9-2 at 65, 99. Further, on several occasions, different medical providers described plaintiff as alert, oriented, or energetic. Dkt. No. 9-8 at 206; Dkt. No. 9-9 at 58, 76. Thus, although plaintiff demonstrated that her Flexeril and Hepatitis caused her to experience symptoms of fatigue, there is no evidence that the fatigue significantly impacted her ability to perform basic work activities. As such, the ALJ's failure to explicitly discuss the impact of plaintiff's fatigue on her RFC does not amount to reversible error.

### b. **ADHD/ADD**

Plaintiff contends that the ALJ committed reversible error in failing to address plaintiff's ADHD/ADD. Plaintiff properly concludes that the ALJ did not discuss plaintiff's ADHD/ADD. There is some evidence in the record that plaintiff has trouble concentrating, and following directions. Dkt. No. 9-2 at 92; 9-7 at 213; Dkt. No. 9-9 at 76. Although plaintiff indicated that she had difficulty focusing and was diagnosed with ADHD/ADD, there is no objective evidence in the record that plaintiff's ADHD/ADD caused any limitation with respect to her ability to perform basic work activities. Plaintiff does not indicate that she was taking medication for her ADHD/ADD, nor does she provide how her ADHD/ADD impacts her ability to perform basic work activities. Further, record evidence does not support that plaintiff has any significant difficulty with attention and concentration. In a consultative examination, plaintiff denied difficulty concentrating. Dkt. No. 9-8 at 206. In a "Medical Examination for Employability

Assessment, Disability Screening, and Alcoholism/Drug Addiction Determination,"
plaintiff's treating provider Dr. Pribis did not list ADHD as one of plaintiff's medical
conditions.  Dkt. No. 9-6 at 196.  In addition, Dr. Pribis provided that plaintiff was only
"moderately limited" in her ability to maintain attention and concentration and
understand and remember instructions.  Id.  In Dr. Neil Berger's consultative
examination, plaintiff's recent and remote memory skills "[s]eemed to be more or less
intact.  She recalled 3 or 3 objects immediately, 2 of 3 after five minutes.  She achieved
6 digits forward and 3 digits backward."  Dkt. No. 9-9 at 63.  Dr. Berger concluded that
plaintiff had only mild limitations in her ability to understand, remember, and carry out
complex instructions.  Id. at 68.

The limited evidence in the administrative record addressing ADD/ADHD
includes plaintiff's report to her medical providers that she felt she had symptoms of
ADD for years, wanted to be evaluated for ADD, and that "[s]he has been told by the
VESID counselor that she probably has ADD."  Dkt. No. 9-7 at 212-13; Dkt. No. 9-9 at
23.  Records from Saratoga County Alcohol and Substance Abuse Services indicate a
"diagnosis" of ADHD.  Dkt. No. 9-8 at 23, 2, 43.  However, there is no explanation for
this diagnosis or whether ADHD was included based on plaintiff's self-reporting of this
condition.  Further, these reports are either signed only by a social worker, who is not
an acceptable medical source, or are unsigned and undated.  Id. at 23, 27, 43.  There
is no indication that plaintiff underwent any treatment or took any medication for ADD or
ADHD.  Furthermore, even if the ALJ erred in failing to conclude that plaintiff's
ADD/ADHD constituted a severe impairment, the ALJ found that plaintiff had other

severe conditions and continued forward with the sequential evaluation.  See, e.g.,

Decker v. Colvin, No. 1:12-CV-1107, 2013 WL 6528845, at *4 (N.D.N.Y. Dec. 12, 2013)

(citing McCartney v. Commissioner of Social Sec., 07-CV-1572, 2009 WL 1323578, at

*16 (W.D.Pa. May 8, 2009) ("Even if the Court was to find that the ALJ did err in

excluding headaches from the list of severe impairments, any such error was harmless

because the ALJ found other severe impairments at step two and proceeded through

the sequential evaluation on the basis of Plaintiff's severe and non-severe

impairments.").  Additionally, although plaintiff's alleged ADD/ADHD was not explicitly

discussed, the ALJ's RFC accounts for limitations in concentration or attention by

limiting plaintiff to simple, unskilled work, involving simple work-related decisions with

only an occasional ability to make complex decisions and perform complex tasks.  Dkt.

No. 9-2 at 25.

Accordingly, the ALJ did not commit reversible error in declining to find that

plaintiff's ADD/ADHD was a severe impairment.


### c. **Traumatic Brain Injury**

Plaintiff provides that she was involved in two car accidents in the late 1980s that

caused her to suffer traumatic brain injury.  Plaintiff reported such accidents and

provided that she suffered head injury and required plastic surgery to her face.  Dkt. No.

9-8 at 22, 195.  Plaintiff, however, provides no medical records relating to this alleged

brain injury.  The court observes that consultative examiner Dr. Neil Berger did observe

that plaintiff had some difficulty with her memory, specifically with dates; however, that

plaintiff may have issues with memory does not lead to a finding that memory issues stem from a traumatic brain injury.  In an office visit with Galway Family Health Center, plaintiff reported having difficulty maintaining attention and concentration as well as remembering and carrying out instructions, but the physician's assistant noted that "her interaction with us today she is very explicit of her history as well as her recent accomplishments and does not seem to have any difficulty remembering these recent events."  Dkt. No. 9-9 at 3.

As the administrative record is entirely lacking in objective evidence suggesting that plaintiff suffered a traumatic brain injury that markedly impacts her ability to perform basic work activities, the ALJ did not commit reversible error in failing to address this condition.  As noted, when "medical evidence establishes only a slight abnormality or a combination of slight abnormalities," a finding of "not severe" is warranted. SSR 85-28, 1985 WL 56856, at *3 (1985).  Further, even if the ALJ had erred in concluding that plaintiff's alleged traumatic brain injury was not severe, the ALJ found that plaintiff suffered other severe conditions and continued through all of the steps of the sequential analysis.  Decker, 2013 WL 6528845, at *4.  Accordingly, the ALJ did not commit reversible error in failing to conclude that plaintiff's alleged traumatic brain injury was a severe condition.

### d.  **Anxiety Disorder and Panic Disorder**

Plaintiff reported her anxiety to several treatment providers, contending that her anxiety "does interfere with her ability to function during the day."  Dkt. No. 9-9 at 74.

Plaintiff was diagnosed with anxiety disorder by her primary care provider, Dr. Pribis; by Patricia Huber, LCSW, during an intake evaluation for Friendship House; and by consultative examiner Dr. Berger. Dkt. No. 9-9 at 13-14, 23, 59. However, there is no objective medical evidence regarding how limited plaintiff is due to her anxiety disorder. The only record evidence addressing the severity of plaintiff's anxiety is a medical source statement from Dr. Pribis wherein plaintiff's anxiety is listed as "stable." Dkt. No. 9-6 at 196.

As for panic disorder, plaintiff reported having severe panic attacks, for which she was prescribed Klonopin, Paxil, and/or Zoloft. Dkt. No. 9-7 at 128, 211. In January 2010, plaintiff described her panic attacks as occurring approximately ten times a week, lasting up to a half of an hour, and that they caused "shaking, agitations, and feeling of numbness in her fingertips." Id. at 128. Plaintiff reported being able to "work through them with deep breathing and relaxation but they are quite severe." Id. In June 2011, plaintiff reported that her panic attacks were "fairly severe," and that she is taking Paxil 20 mg per day and was "tolerating it well[.]" Dkt. No. 9-9 at 13. Also in June 2011, plaintiff reported that she felt "calmer" when on Paxil, and Dr. Pribis observed that plaintiff "is managing despite a lot of stress in her life." Id. at 14.

Listing 12.06 addresses anxiety-related disorders. 20 C.F.R. Pt. 404, Subpt. P, Appx. 1. Section A calls for "medically documented findings" of either "a persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation"; or "recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear,

terror and sense of impending doom occurring on the average of at least once a week";
or "recurrent obsessions or compulsions which are a source of marked distress"; or
"recurrent and intrusive recollections of a traumatic experience, which are a source of
marked distress"; or "generalized persistent anxiety accompanied by three out of four of
the following signs or symptoms": motor tension, or autonomic hyperactivity, or
apprehensive expectation, or vigilance and scanning. 20 C.F.R. Pt. 404, Subpt. P, App.
1, § 12.06.  If a claimant meets the requirements of part A, she must still meet the
criteria in part B or part C of section 12.06 to be qualified as disabled at step three. Id.
Step B is met if the claimant suffers from at least two of the following: "marked
restriction of activities of daily living"; "marked difficulties in maintaining social
functioning"; "marked difficulties in maintaining concentration, persistence, or pace";
"repeated episodes of decompensation, each of extended duration."  Id.  If a claimant
meets the criteria in paragraph A, explained above, but does not satisfy the
requirements of paragraph B, she must still be found disabled at step three of the five
step inquiry process if she is completely unable to function independently outside the
area of her home, as explained in paragraph C.  Id.

The ALJ did not explicitly mention plaintiff's anxiety or panic disorder in his
severity assessments.  However, at step two, the ALJ concluded that "[t]he severity of
[plaintiff]'s mental impairments, considered singly and in combination, do not meet or
medically equal the criteria of listings 12.04 and 12.06."  Dkt No. 9-2 at 23.
In referencing listing 12.06, the ALJ appears to be reviewing plaintiff's anxiety related
disorders.  In assessing plaintiff's mental impairments, the ALJ considered whether

plaintiff met the paragraph B and paragraph C criteria for listings 12.04 or 12.06.  In

reviewing the requirements for anxiety-related disorders under listing 12.06, the ALJ

reasonably concluded that plaintiff failed to demonstrate that she met the requirements

of paragraph B and C.  First addressing the paragraph B criteria, the record supports

that plaintiff did not demonstrate that she suffered marked restrictions in her activities of

daily living; social functioning; concentration, persistence, or pace; nor did she

demonstrate that she suffered from repeated episodes of extended decompensation of

an extended duration.  20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 12.06.  Plaintiff was able

to clean, groom herself, cook, take public transportation, and attend social functions, as

well as therapy and other medical appointments.  Further, despite some difficulty with

memory, no medical provider diagnosed plaintiff with anything more than moderate

limitations in attention or concentration.  Dkt. No. 9-6 at 196; Dkt. No. 9-8 at 206; Dkt.

No. 9-9 at 63, 66.  Plaintiff further demonstrated no episodes of decompensation

relating to her panic or anxiety disorder lasting an extended duration of two weeks or

more.[19]  20 C.F.R. Pt. 404, Subpt. P, Appx. 1, §§ 12.00; 12.06.

   As for paragraph C criteria, plaintiff did not demonstrate that she was unable to

function outside independently outside of her home.  Plaintiff was able to visit the

---

[19]    Episodes of decompensation "are exacerbations or temporary increases in symptoms or
signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities
of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace.
Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would
ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes
of decompensation may be inferred from medical records showing significant alteration in medication; or
documentation of the need for a more structured psychological support system (e.g., hospitalizations,
placement in a halfway house, or a highly structured and directing household); or other relevant
information in the record about the existence, severity, and duration of the episode."  20 C.F.R. Pt. 404,
Subpt. P, Appx. 1, § 12.00.  Repeated episodes of decompensation means "three episodes in one year, or
an average of once every four months, each lasting for at least two weeks."  Id.

grocery store, attend AA meetings, attend social functions, and therapy sessions. Thus, substantial evidence supports that plaintiff did not meet the paragraph C criteria of listing 12.06.

Therefore, even if plaintiff were able to meet the criteria of paragraph A regarding her anxiety or panic disorder, plaintiff must be able to demonstrate that she also meets the requirements of either paragraph B or C. As substantial evidence supports the ALJ's finding that plaintiff did not meet the criteria of paragraphs B or C, the ALJ did not err in failing to conclude that plaintiff's anxiety or panic disorder were severe impairments.

3. **Step Three**

a. **The Listings**

Plaintiff argued that the ALJ failed to consider or sufficiently consider her PTSD and depression under step two, the severity analysis. Dkt. No. 10 at 19. However, as the ALJ concluded that plaintiff's PTSD and dysthymic disorder, a form of depression, were severe conditions, it appears that plaintiff intended to address these arguments under step three for an assessment whether the ALJ's conclusions that these conditions do not meet or equal the severity of one of a listed impairments.[20]

The Commissioner's determination whether a claimant's impairment meets or

---

[20]  The Commissioner publishes a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). Listed impairments are presumptively disabling. See 20 C.F.R. §§ 416.920(a)(4)(iii), (d).

equals the Listings must reflect a comparison of the symptoms, signs, and laboratory findings about the impairment, including any functional limitations that result from the impairment, with the corresponding criteria shown for the listed impairment. 20 C.F.R. §§ 416.925, 416.926a; see also Giles v. Chater, 95-CV-10E(H), 1996 WL 116188, at *5-6 (W.D.N.Y. 1996). An ALJ has a legal duty to consider "all evidence" in the case record before making a determination as to whether a claimant is eligible for disability benefits. 20 C.F.R. § 416.920(a)(3); see Sutherland v. Barnhart, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence as supports his determination, without affording consideration to evidence supporting the plaintiff's claims. It is grounds for remand for the ALJ to ignore parts of the record that are probative of the plaintiff's disability claim."); see also Lopez v. Sec'y of Dep't of Health & Human Svcs., 728 F.2d 148, 150-51 (2d Cir. 1984) ("We have remanded cases when it appears that the ALJ has failed to consider relevant and probative evidence which is available to him.").

### i. **PTSD**

Plaintiff argues that the ALJ gave little or no consideration to plaintiff's PTSD. Dr. Neil Berger performed a consultative psychological examination of plaintiff. He concluded that plaintiff suffered from PTSD. Dkt. No. 9-9 at 59. Patricia Huber, LCSW, who performed an intake psychological examination of plaintiff for Friendship House,

also diagnosed plaintiff as suffering from PTSD arising out of an incident of date rape.[21] Dkt. No. 9-9 at 57, 76. There is little record evidence regarding how plaintiff's PTSD impacts her ability to perform basic work activities, and no medical provider offered an opinion as to the severity of this condition.

Listing 12.06 addresses anxiety-related disorders, including "[r]ecurrent and intrusive recollections of a traumatic experience, which are a source of marked distress." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1. Although the ALJ did not explicitly separate out plaintiff's PTSD when addressing plaintiff's mental impairments at step three of the sequential evaluation, the ALJ specifically considered listing 12.06 in concluding that "[t]he severity of [plaintiff]'s mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.04 and 12.06." Dkt No. 9-2 at 23. The ALJ noted that plaintiff has mild restrictions in her activities of daily living; mild difficulties in social functioning; and moderate difficulties in concentration, persistence or pace. Dkt. No. 9-2 at 24.

Even if the ALJ erred failing to separately discuss plaintiff's PTSD in step three of the sequential evaluation, such error is harmless, as the ALJ's conclusion that plaintiff cannot meet the paragraph B or C criteria with regard to any mental impairment is supported by substantial evidence. See generally Zabala v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) ("[w]here application of the correct legal principles to the record could lead [only to the same] conclusion, there is no need to require agency

---

[21]   The ALJ observed that Ms. Huber is not an acceptable medical source, but noted that her opinion and observations, support Dr. Berger's diagnosis." Dkt. No. 9-2 at 22.

reconsideration.").  As discussed, plaintiff does not have marked restrictions of daily living, marked difficulties in social functioning, marked difficulties in maintaining concentration, persistence, and pace, repeated episodes of decompensation of an extended duration, or an inability to function independently outside of her home.  See 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 § 12.06.

Accordingly, the ALJ's conclusion that plaintiff's PTSD did not meet or equal a listing is supported by substantial evidence.


ii.  **Depression**

Plaintiff argues that the ALJ erred in failing to consider, or in giving little weight to, her depression.  The ALJ concluded that plaintiff suffered from "a dysthymic disorder," which is "a chronic depression, but with less severity than a major depression."  Stevens v. Barnhart, 473 F. Supp. 2d 357, 363 (N.D.N.Y. Feb. 13, 2007) (citing Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000).  It appears that plaintiff is contending that the ALJ erred by failing to conclude that plaintiff's Dysthymic Disorder did not meet or equal a listed impairment.  See SSR 96-8p.

The burden is on the plaintiff to present medical findings which show that his or her impairments match a listing or are equal in severity to a listed impairment.  Sullivan v. Zebley, 493 U.S. 521, 530-31 (1990); Zwick v. Apfel, 97-CV-5140 (JGK), 1998 WL 426800, at *6 (S.D.N.Y. July 27, 1998).  In order to show that an impairment matches a listing, the claimant must show that his or her impairment meets all of the specified

medical criteria.  <u>Sullivan</u>, 493 U.S. at 530; 20 C.F.R. § 416.925(d). If a claimant's impairment "manifests only some of those criteria, no matter how severely," such impairment does not qualify.  <u>Sullivan</u>, 493 U.S. at 530.  To make this showing, the plaintiff must present medical findings equal in severity to all requirements which are supported by medically acceptable clinical and laboratory diagnostic techniques. 20 C.F.R. § 416.926.

In assessing plaintiff's RFC, the ALJ acknowledged that plaintiff reported "problems with depression including isolation, crying, not wanting to leave her home, and not eating or sleeping."  Dkt. No. 9-2 at 25.  The ALJ assessed plaintiff's RFC under the relevant listing, 12.04, Affective Disorders, and applied the "special technique" outlined in 20 C.F.R. § 404.1520(a) to conclude that plaintiff did not satisfy the "paragraph B" criteria.  <u>See</u> Dkt. No. 9-2 at 23.  First, there is no evidence that plaintiff had any *marked* restrictions in her activities of daily living; social functioning; or maintaining attention, concentration, or pace.  <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 §§ 12.04(A), 12.04(B).  As noted, plaintiff was able to groom herself, cook, perform most of the cleaning, go grocery shopping as long as she had assistance carrying bags, use public transportation, and attend therapy sessions.  Thus, plaintiff does not suffer marked restrictions in her activities of daily living.  As to plaintiff's social functioning, although plaintiff reported social anxiety to certain providers, no medical provider concluded that plaintiff had anything beyond a mild difficulty relating appropriately to supervisors, coworkers, or the public.  Dkt. No. 9-9 at 67.  Further, the record supports that plaintiff was able to engage in social activities – she attended AA and group

43

therapy sessions; attended functions such as dances; went to dinner with AA members; lived with roommates at times, with whom she interacted; interacted with her children and grandchild, and used public transportation. Dkt. No. 9-2 at 98; Dkt. No. 9-9 at 56. Several medical providers described plaintiff as pleasant and friendly during examinations. Dkt. No. 9-7 at 219; Dkt. No. 9-9 at 56, 76. In addition, although plaintiff alleges difficulty with concentration, no medical provider diagnosed her as having anything more than mild limitations as to her concentration. Dkt. No. 9-9 at 58, 65-66. As for episodes of decompensation of an extended duration, plaintiff notes having a few days per month where she feels she cannot get out of bed (Dkt. No. 9-2 at 65, 92-93); however, despite these few days of the month, there is no evidence that these occurrences amount to episodes decompensation of an extended duration, as set forth in the Listings. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. Further, plaintiff did not provide at the hearing nor to any treating providers that an increase in mental demands or a change in the environment would cause her to decompensate. Id. § 120.04 (B).

The ALJ also properly determined that plaintiff did not meet the "paragraph C" criteria[22] – there is no evidence of repeated episodes of deterioration or

---

[22] An affective disorder, such as depression or bipolar disorder, will qualify as a "listed impairment" if there is medically documented persistence, either continuous or intermittent, of depressive syndrome, manic syndrome, or bipolar syndrome resulting in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 §§ 12.04(A), 12.04(B) ("paragraph B criteria"). If the mental disorder does not qualify as a listed impairment under these standards, it will still qualify as a disability if there is:

> [a] [m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: [r]epeated episodes of decompensation, each of extended

decompensation of an extended duration; decompensation due to minimal increase in mental demands or change in the environment; or an inability or history, for one year or more, to function outside of a highly supportive living arrangement.  Dkt. No. 9-2 at 24; see 20 C.F.R Pt. 404, Subpt. P, App'x 1 § 12.04(C).  No medical provider ever concluded that plaintiff's depression caused anything more than moderate limitations in her work-related functioning.  Plaintiff reported no suicidal thoughts, but did report "a history of hitting herself."  Dkt. No. 9-9 at 57, 76.  Plaintiff reported to primary care provider Dr. Pribis that her mood was "even" on medication.  Dkt. No. 9-9 at 7.  Further, there is no medical evidence that plaintiff would decompensate due to minimal increases to mental demands or changes in her environment.  20 C.F.R. Pt. 404, Subpt. P, App'x. 1 § 12.04(C).  Similarly, there is no evidence that plaintiff must be in a highly-supportive living environment to function.  Plaintiff testified to living on her own or living with roommates and being able to function, clean the apartment, go shopping for groceries, maintain hygiene, and go to therapies.  Dkt. No. 9-2 at 65, 99.  Further, the ALJ considered plaintiff's depression insofar as the RFC accommodated limitations to unskilled work, occasional complex decision and work tasks, and only occasional interaction with others.  Dkt. No. 9-2 at 25.

Accordingly, the undersigned finds no error in the ALJ's finding that plaintiff's

---

duration; or a [r]esidual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or [c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R Pt. 404, Subpt. P, App'x 1 § 12.04 (C) ("paragraph C criteria").

dysthemic disorder did not satisfy the paragraph B or C criteria and, such, that plaintiff's depression did not meet or equal a listed impairment is supported by substantial evidence.

### b. **RFC**

Plaintiff contends that substantial evidence does not support the ALJ's findings regarding her RFC insofar as he concluded that she retained the ability to perform light work.

RFC describes what a claimant is capable of doing despite his or her impairments, considering all relevant evidence, which consists of physical limitations, symptoms, and other limitations which go beyond the symptoms. Martone v. Apfel, 70 F. Supp. 2d 145,150 (N.D.N.Y. 1999); 20 C.F.R. §§ 404.1545, 416.945 (2003). "In assessing RFC, the ALJ's findings must specify the functions plaintiff is capable of performing; conclusory statements regarding plaintiff's capacities are not sufficient." Martone, 70 F. Supp. 2d at 150. RFC is then used to determine whether the claimant can perform his or her past relevant work in the national economy. New York v. Sullivan, 906 F.2d 910, 913 (2d Cir. 1990); 20 C.F.R. §§ 404.1545, 416.960 (2003).

### i. **Physical Capacity**

Plaintiff argues that the ALJ erred in finding that she had the physical ability to perform light work because "plaintiff was found capable of no more than three hours in an eight hour day of standing, walking or sitting." Dkt. No. 10 at 21. Plaintiff further

argues that, because she was unable to "withstand the physical and mental rigor of intensive day treatment, a situation in which she would be able to alter her position as needed," she would be unable to perform light work. Id. Further, she notes that the ALJ found that plaintiff was unable to perform her past work, but opines that plaintiff's past relevant work making sandwiches at Blimpie's "cannot be considered to be significantly different from the positions of photocopy machine operator, collator operator or laundry sorter." Id.

As discussed above, light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567; see also 20 C.F.R. § 416.977.

As defendant correctly points out, plaintiff's interpretation of the record, insofar as she references the limitations that consultative examiner Dr. Rogers reached regarding plaintiff's ability to sit/stand/walk is incorrect. Rather than finding that plaintiff could only walk or stand for a *combined total* of three hours in an eight hour day, Dr. Rogers concluded that plaintiff could stand or walk for three hours *each*, for thirty

47

minutes at one time, during an eight-hour day.  Dkt. No. 9-8 at 198.[23]  The ALJ gave this

portion of Dr. Rogers' opinion "great weight," and included some of these limitations into

his RFC.  Dkt. No. 9-2 at 25, 27.  However, despite the "great weight" the ALJ purported

to assign to this portion of Dr. Rogers' assessment, the ALJ departs from Dr. Rogers'

assessment insofar as he provides that plaintiff can "sit for more than six hours total in

an eight-hour work day, with a need to be able to change position every 60 minutes."

As noted, Dr. Rogers' consultative examination concluded that plaintiff could only

sit/stand/walk for thirty minutes at a time, for a total of three hours of sitting in an eight-

hour day, and determined that plaintiff must be able to change her position every thirty

minutes, not every sixty minutes.  Dkt. No. 9-8 at 198.  Similarly, Dr. Pribis opined that

plaintiff had moderate limitations in her ability to sit.  Dkt. No. 9-6 at 195.  Plaintiff

reported that she could sit for no more than one half of an hour or an hour at a time and

needed to readjust every fifteen minutes.  Dkt. No. 9-2 at 63.  Although the ALJ found

that plaintiff was not a credible reporter as to her pain, an ALJ cannot substitute his

judgment for that of competent medical professionals.  See, e.g., McBrayer v. Secretary

of Health and Human Svcs., 712 F.2d 795, 799 (2d Cir.1983).  There is no medical

evidence in the record finding that plaintiff could sit for longer than three hours in one

day or longer than thirty minutes at one time. Thus, insofar as the ALJ concluded that

plaintiff could sit for six hours total in an eight hour work day with a need to change

position every sixty minutes, such portion of his RFC is does not properly reflect the

_____

[23]  This reading is further reflected in Dr. Rogers' medical source statement insofar as he did not
provide an answer to the question: "[i]f the total time for sitting, standing and walking does not equal or
exceed 8 hours, what activity is the individual performing for the rest of the 8 hours?," suggesting that
plaintiff could sit/stand/walk for a combined total of more than eight hours.  Dkt. No. 9-8 at 198.

limitations set forth in medical records of Dr. Rogers, to which he afforded great weight, or the findings of plaintiff's treating provider, Dr. Pribis.  Therefore, this portion of the ALJ's RFC is unsupported by substantial evidence.

The undersigned also observes that the step five analysis – whether plaintiff could perform any other work given her RFC – is also affected by the faulty RFC assessment.  Dkt. No. 9-2 at 28.  The first two hypotheticals the ALJ posed to the VE were based on an a hypothetical claimant's ability to sit for six hours in an eight hour work day, an ability for which the undersigned cannot find support in the record.  Dkt. No. 9-2 at 69, 75.  In the third hypothetical, the ALJ asked whether sedentary work[24] would be available for a claimant who could sit, stand, and walk for only two hours each, for thirty minutes at a time before needing to change positions; and could lift twenty pounds occasionally, and ten pounds frequently.  Id. at 74.  Under this hypothetical, the VE reported that "there'd be no work for somebody with just six hours' worth of work."  Id. at 74.  When presented with a hypothetical that appears most reflective of plaintiff's sitting limitations, as supported by Dr. Rogers and Dr. Pribis' assessments, the VE proposed that there would be no jobs that the hypothetical claimant could perform that existed in significant numbers.  Thus, in relying on the VE's responses to the hypotheticals, which, according to medical evidence in the record, were not entirely reflective of plaintiff's sitting abilities or limitations, the Commissioner did not meet her burden at step five.  Dumas, 712 F.2d at 1554; De Leon v. Secretary

---

[24] "If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time. 20 C.F.R. § 416.967(b).

49

of Health and Human Scvs., 734 F.2d 930, 936 (2d Cir. 1984) (finding the determination unsupported by substantial evidence where the ALJ's hypothetical to the VE did not present the full extent of the plaintiff's disabilities).

Accordingly, as the RFC insofar as it relates to plaintiff's physical limitations is not based on substantial evidence, it is recommended that the matter be remanded for reconsideration of plaintiff's RFC regarding her limitations in sitting, and it is further recommended that, following reconsideration of plaintiff's physical RFC, the ALJ consult a vocational expert to assess whether there are jobs in the national economy in significant numbers that plaintiff could perform.

### ii. **Mental Capacity**

Plaintiff argues that the ALJ's RFC assessment is unsupported by substantial evidence because "[w]hen pain, fatigue and memory loss are added into the mix, the erosion to plaintiff's residual functional capacity to engage in any work at any exertional level becomes evident." Dkt. No. 10 at 21. However, Dr. Berger found no more than mild limitations due to plaintiff's memory issues. Similarly, Dr. Pribis concluded that plaintiff was moderately limited in her ability to remember and carry out instructions. Dkt. No. 9-6 at 96. The ALJ properly took any limitations in plaintiff's memory into account when he limited plaintiff to simple, unskilled work.

Further, although the record contains periodic complaints of fatigue to her primary care provider and at the hearing, it does not contain an assessment by an acceptable medical source of work-related limitations due to plaintiff's fatigue. Further,

there are instances throughout the record where plaintiff reported getting seven to eight hours of sleep per night. Dkt. No. 9-8 at 206. Moreover, plaintiff did not indicate that her fatigue interfered with her ability to perform her activities of daily living. See Dkt. No. 9-2 at 99. Likewise, insofar as plaintiff argues that the ALJ has failed to consider her pain in the RFC analysis, although there is evidence that plaintiff's neck, back, and knee conditions caused her pain, the ALJ reasonably found plaintiff not to be credible insofar her complaints of pain due to some inconsistency with her activities of daily living as well as a possible tendency to exaggerate pain in order to abuse narcotics. Further, the RFC included limitations on sitting,[25] standing, and walking in order to address these complaints.

The undersigned does not find that the ALJ erred in his assessment of plaintiff's RFC insofar as it related to assessing plaintiff's fatigue; pain, beyond her limitations in sitting; and memory issues. Accordingly, substantial evidence supports the ALJ's RFC finding insofar as it relates to plaintiff's fatigue, memory loss, and complaints of pain, excepting the aforementioned sitting limitations.

## III. **Conclusion**

**WHEREFORE**,

For the reasons stated above, it is hereby **RECOMMENDED** that the Commissioner's decision denying disability benefits be **REMANDED,** pursuant to 42

---

[25] Except where indicated on pages 47-50, regarding sitting limitations, the ALJ's assessment of plaintiff's physical limitations is supported by substantial evidence.

U.S.C. § 405(g), for further proceedings consistent with this decision; and it is

**ORDERED**, that copies of this Report-Recommendation and Order be served on the parties in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fouteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Services, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.

**IT IS SO ORDERED.**

Dated: August 31, 2015
     Albany, New York

Christian F. Hummel
U.S. Magistrate Judge